J-A26006-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMIE LYNN SILVONEK | : | |
| | : | |
| Appellant | : | No. 577 EDA 2022 |

Appeal from the PCRA Order Entered January 31, 2022
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s):  CP-39-CR-0002141-2015

BEFORE:   BOWES, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED JANUARY 19, 2023**

Jamie Lynn Silvonek appeals from the January 31, 2022 order, denying her petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA"). We affirm.

**I. Facts and Procedural History**

The underlying case stems from Appellant's guilty plea to first-degree murder and related charges for her participation in the stabbing death of her mother, Cheryl Silvonek.  The parties are familiar with the underlying facts of the case and we therefore do not recount them here.  However, by way of brief background, we observe that Appellant's mother had recently discovered that Appellant, who was fourteen years old at the time of the homicide, was in a sexual relationship with Caleb Barnes, a twenty-year-old soldier.

_____

[*] Retired Senior Judge assigned to the Superior Court.

Appellant "was the instigator and willing participant in the murder of her mother, who was standing in the way of a continuing sexual relationship between [Appellant] and . . . Barnes[.]" *Commonwealth v. Silvonek*, 175 A.3d 1061 (Pa.Super. 2017) (unpublished memorandum at 4) (footnote omitted) ("*Silvonek*").

Of relevance to this appeal, Appellant petitioned the trial court to have her case decertified to the juvenile court prior to entering the abovementioned guilty plea. The court held a two-day hearing, during which Appellant presented testimony from Frank Dattilio, Ph.D., and Stephen Berkowitz M.D., who opined that Appellant was amenable to treatment and recommended decertification, as well as juvenile probation officer Lisa Costello, who testified about available juvenile facilities. The Commonwealth presented testimony from, *inter alia*, John O'Brien, II, M.D., J.D., who testified that in his opinion, no expert could ascertain whether Appellant was amenable to treatment and, therefore, decertification was not appropriate.

After taking the matter under advisement, the trial court denied Appellant's petition, concluding that "the juvenile system is inadequate to supervise, treat or rehabilitate [Appellant]." Trial Court Opinion, 11/19/15, at 35. The trial court found that "the sophistication of the crimes committed and [Appellant's] degree of culpability in the commission thereof" to be the most heavily-weighted factors against decertification. *See id*. at 25-26, 36. Additionally, the court credited Dr. O'Brien's report while finding the

- 2 -

foundations on which Dr. Dattilio and Dr. Berkowitz based their reports and opinions flawed, and therefore rejected their opinions. *See id*. at 27-31.

Thereafter, Appellant entered the above-referenced negotiated guilty plea and was sentenced to a term of incarceration of thirty-five years to life. Appellant filed a direct appeal to this Court challenging the trial court's denial of her decertification petition. Upon review, we affirmed. *See Silvonek*, *supra*. Our Supreme Court denied Appellant's petition for allowance of appeal. *See Commonwealth v. Silvonek*, 181 A.3d 1073 (Pa. 2018).

Appellant timely filed the instant PCRA petition, her first, with the assistance of counsel. Therein, Appellant averred, *inter alia*, that trial counsel, John Waldron, Esquire, committed several errors that resulted in Appellant being deprived effective representation with respect to her decertification hearing, guilty plea, and appeal. According to Appellant, Attorney Waldron's ineffectiveness "prejudiced [Appellant's decertification] case as his failures resulted in the court disregarding both of [Appellant's] experts' opinions regarding [Appellant's] amenability to treatment" and "created a record void of any favorable evidence on [Appellant's] behalf." Petition for *Habeas Corpus* and Post-Conviction Relief, 5/6/19, at 85 (cleaned up). Appellant also raised a claim that her guilty plea was not knowing or voluntary. *Id*. at 122-133. Several filings followed this petition, including an amended petition filed with

leave of court, which added new factual materials and updated case law.[1] **See** Motion for Leave to Amend Petition for *Habeas Corpus* and Post-Conviction Relief, 10/14/20; Amended Petition for *Habeas Corpus* and Post-Conviction Relief, 1/22/21.

The PCRA court held a six-day hearing, during which Appellant presented the testimony of Attorney Waldron, Dr. Dattilio, Dr. Berkowitz, Marty Beyers, Ph.D., and seven additional witnesses. The Commonwealth called Dr. O'Brien. After review, the PCRA court denied Appellant's petition.

This timely-filed appeal followed. Both Appellant and the PCRA court have complied with Pa.R.A.P. 1925.[2] Appellant presents the following issues for our consideration:

1. Whether the guilty plea offered by Appellant . . ., a 14-year old child whose 21-year old boyfriend murdered her mother, was involuntary when, before she entered her plea, her trial counsel discussed plea terms with the trial court judge and told [Appellant] that the court would not accept a plea of less than 35 years to life, violating the prohibition on trial court participation in plea discussions (**see Commonwealth v. Evans**, 252 A.2d 689 (Pa. 1969))?

2. Whether [Appellant's] trial counsel ineffectively represented [Appellant] given, *inter alia*: (a) his failure to present mitigating fact evidence at [Appellant's] decertification hearing; (b) his failure to inform his experts of material

_____

[1] The Honorable Maria Dantos, who had served as the trial court judge, presided over the initial PCRA proceedings. The matter was reassigned to the Honorable Anna-Kristie Marks ("PCRA court") following Appellant's motion to for leave to file an amended petition. The PCRA court granted the motion and has since presided over the PCRA proceedings.

[2] The PCRA court has directed us to its January 31, 2022 opinion in support of its dismissal order.

J-A26006-22

evidence; (c) his improper involvement of the court in plea discussions and failure to discuss the plea deal with [Appellant] until the terms were set by the court; and (d) his failure on appeal to cite controlling authority to this Court that contradicted the trial court's findings?

Appellant's brief at 5 (cleaned up).

On appeal from a PCRA court's decision, our scope of review is "limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party." *Commonwealth v. Johnson*, 236 A.3d 63, 68 (Pa.Super. 2020) (*en banc*) (cleaned up). The PCRA court's credibility determinations are binding upon this Court when supported by the certified record, but we review its legal conclusions *de novo*. *Id*.

## II. Challenge to the Voluntariness of the Guilty Plea

Appellant first argues that the PCRA court erred in dismissing her claim that her plea was involuntary as a result of the trial court's participation in the plea negotiations. Regarding the underlying claim, Appellant avers that the court's participation violated her constitutional rights and that her plea was rendered involuntary as a result of Attorney Waldron's ineffective decision to invite the trial court to participate in the plea negotiations. *See* Appellant's brief at 32 (citing 42 Pa.C.S. § 9542(a)(2)(i) (constitutional violation) and 42 Pa.C.S. § 9542(a)(2)(ii) (ineffective assistance of counsel)). Relying on *Evans*, *supra*, Appellant contends that "[t]he trial court's participation in setting the terms of [Appellant's] plea, which happened before [Appellant]

- 5 -

ever even had a chance to consider what plea she might want to make, renders her plea involuntary as a matter of law." *Id*. at 36-37.

We consider this claim mindful of the following:

> Under the PCRA, allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused the petitioner to enter an involuntary or unknowing plea. Where the defendant enters his plea on the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases.
>
> To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

*Commonwealth v. Brown*, 235 A.3d 387, 391 (Pa.Super. 2020) (cleaned up).

This Court has held that "inadvertent encouragement" to enter a plea is permissible. *See Commonwealth v. Siers*, 464 A.2d 1307, 1311 (Pa.Super. 1983). However, "deliberate participation by the judiciary in the plea bargaining process has been held to be improper in Pennsylvania." *Id*. (citation omitted). In *Evans*, our Supreme Court forbade "any participation by the trial judge in the plea bargaining prior to the offering of a guilty plea." *Evans*, *supra* at 691 (cleaned up). Our High Court noted that this rule was consistent with the American Bar Association's ("ABA") minimum standards. Specifically, the ABA standards allowed the parties to request, after a "tentative plea agreement ha[d] been reached which contemplate[d] the entrance of a plea of guilty or *nolo contendere* in the expectation that . . .

sentence concessions will be granted," that the trial court "permit the disclosure . . . of the tentative agreement and the reasons therefor in advance of the time for tender of the plea." *Id*. at 691 n.* (cleaned up). The Court reasoned that "[t]his limited action by the trial judge is allowed on the theory that a greater degree of certainty that the bargain will be accepted is necessary for the operation of the system." *Id*.

The High Court emphasized, however, that such limited action "does not contemplate participation by the judge in the plea discussions." *Id*. (cleaned up). Rather, "[t]he judge only becomes involved after the parties have reached agreement, and thus there would appear to be little basis upon which the defendant or counsel could conclude that the judge is attempting to force a certain result upon the parties." *Id*. (cleaned up). Thus, "before a plea bargain or a guilty plea may be categorized as involuntary by virtue of improper judicial conduct, the participation by the judiciary must be found to be 'active' in nature." *Siers*, *supra* at 1311 (citation omitted). Our legislature has amended the Rules of Criminal Procedure to reflect this longstanding practice. *See* Pa.R.Crim.P. 590, Comment (explaining that "[t]he 1995 amendment deleting former paragraph (B)(1) eliminates the absolute prohibition against any judicial involvement in plea discussions in order to align the rule with the realities of current practice").

In the case *sub judice*, the PCRA court held an evidentiary hearing and thereafter made the following factual findings. Attorney Waldron reached out to the District Attorney's Office to begin plea negotiations after the trial court

denied Appellant's decertification petition. During the negotiations, the Commonwealth "made it clear, in no uncertain terms, that the Commonwealth would not accept a plea to anything less than murder of the first degree." PCRA Court Opinion, 1/31/22, at 6 n.7 (cleaned up). The Commonwealth offered to set the "cap of the minimum sentence at thirty-five (35) years in exchange for a guilty plea to" first-degree murder. *Id*. at 6. The PCRA court concluded that, at this point, the agreement between the Commonwealth and Attorney Waldron constituted a "fully-formed plea proposal." *Id*.

Attorney Waldron, being familiar with the trial court's strict sentencing practices, was concerned that it would not accept the proposed plea. Therefore, before presenting the offer to Appellant, Attorney Waldron and the District Attorney's Office scheduled a conference with the trial court to determine if the court would accept the plea agreement. At the conference, the trial court indicated that it would not accept a minimum sentence below thirty-five years but would accept a fixed minimum sentence of thirty-five years.

In addition to the evidence adduced at the PCRA hearing, the PCRA court credited the trial court's statement that it did not interject itself into the plea negotiations. *See id*. at 6 n.9 (citing Trial Court Order, 6/7/19, at 2 n.1 ("[A]t no point did th[e trial c]ourt directly participate in plea negotiations in this matter. Instead, trial counsel and the Commonwealth requested a meeting with the [c]ourt to determine if this [c]ourt would reject a potential plea.")). Based upon the foregoing, the PCRA court found "it extremely clear that the

trial court did not participate in plea negotiations" and therefore Appellant's "claim that the plea was involuntary in this regard must fail." *Id*. at 6.

According to Appellant, the PCRA court erred in crediting the trial court's "*sua sponte*" statement based on the premise that "[i]t was improper for [the trial court] to profess from the bench personal knowledge regarding [its] participation in [Appellant's] plea bargaining, and equally improper for the PCRA court to rely on those non-evidentiary representations." Appellant's brief at 33. Moreover, Appellant avers that the PCRA court's conclusion that the plea was voluntary was belied by the PCRA court's recitation of facts. *Id*. at 34. She maintains that her plea was involuntary because the trial court participated in the negotiations before the plea offer was presented to Appellant. *Id*. at 36-37. Finally, Appellant asserts the PCRA court erred by addressing this claim under 42 Pa.C.S. § 9542(a)(2)(iii) instead of subsections (a)(2)(i) or (a)(2)(ii).

While we agree that the PCRA court considered this claim pursuant to the wrong subsection, this Court may affirm the decision of the PCRA court on any legal basis apparent from the record. *See Commonwealth v. Parker*, 249 A.3d 590, 595 (Pa.Super. 2021) (citation omitted). At Appellant's evidentiary hearing, Attorney Waldron explained that although his declaration attached to Appellant's PCRA petition indicated he met with the Commonwealth to begin plea negotiations **after** speaking with the trial court, he thereafter refreshed his recollection with contemporaneous email exchanges documenting that the plea negotiations in this case occurred

- 9 -

**before** the parties' meeting with the trial court. *See* N.T. PCRA Hearing, 10/4/21, at 29-30. Attorney Waldron clarified that once the trial court denied Appellant's decertification petition, he filed a recusal motion, which the court denied, and approached the District Attorney's Office to begin plea negotiations. *Id*. at 24, 139. The PCRA court credited Attorney Waldron's testimony that the plea negotiations occurred before the meeting with the trial court. Upon review, we conclude that the PCRA court's factual findings and credibility determinations are supported by the certified record.

As explained by Attorney Waldron, the District Attorney's Office and the District Attorney himself were steadfast during the plea negotiations that the Commonwealth would only accept a guilty plea to first-degree murder. Attorney Waldron hoped to secure the statutory minimum sentence of twenty-five years based upon Appellant's age. The Commonwealth did not agree to a minimum sentence of twenty-five years but, in exchange for Appellant's cooperation and her entry of a guilty plea to first-degree murder, the Commonwealth offered to recommend a cap of thirty-five years for Appellant's minimum sentence. *Id*. at 147-48. In other words, the Commonwealth was willing to accept a minimum sentence, to be set by the trial court, of between twenty-five and thirty-five years, in exchange for Appellant's cooperation in the Commonwealth's case against co-defendant Barnes and a guilty plea to first-degree murder.

Attorney Waldron testified he was concerned that, given his experience with the trial court's strict sentencing practices, an open plea could result in a

- 10 -

minimum sentence closer to fifty years. Therefore, he and the District Attorney's Office requested a conference with the trial court to determine whether the court would accept the "fully-formed potential plea," which, stated again, was a guilty plea to first-degree murder and cooperation with the Commonwealth in exchange for the minimum sentence to be capped at thirty-five years of incarceration. *Id*. at 24-25, 27, 147-49. During the conference, the trial court indicated it would accept the plea at a minimum sentence set at the cap of thirty-five years but would not accept a plea with a minimum sentence below that cap. *Id*. at 24-25, 149. Accordingly, when Attorney Waldron presented the plea offer to Appellant in the presence of her father, he explained that although the Commonwealth had offered a minimum sentence to be capped at thirty-five years, the trial court would only accept a plea with the minimum sentence at the top of that ceiling, *i.e.*, thirty-five years.[3] *Id*. at 25, 27, 155-57. Ultimately, Appellant provided a proffer to the Commonwealth, accepted the plea offer, and was sentenced in accordance with the negotiated plea.

Based on the foregoing, we discern no error in the PCRA court's conclusion that the trial court did not actively participate in the plea negotiations. Rather, the certified record bears out that the parties reached

---

[3] Attorney Waldron testified that he did not formally discuss the potential of a plea before the court ruled on Appellant's decertification because he was hopeful that her case would be decertified. Nonetheless, he testified that Appellant was aware of the sentencing possibilities for the crimes charged prior to their plea discussions. *See* N.T., 10/4/21, at 150-52.

an agreement before requesting permission to disclose the proposed agreement to the trial court to determine if the court would accept it.[4] This practice has been specifically condoned by our courts. *See Evans*, *supra* at 691 n.* (noting that, because "a greater degree of certainty that the bargain will be accepted is necessary for the operation of the system," the parties are permitted to request, after a "tentative plea agreement has been reached which contemplates the entrance of a plea of guilty," that the trial court "permit the disclosure . . . of the tentative agreement and the reasons therefor in advance of the time for tender of the plea" (cleaned up)).

Stated simply, the trial court did not actively participate in the plea negotiations. *Evans* does not require, as Appellant claims, that counsel present the fully-formed plea offer to a defendant before consulting the trial judge as to whether it would be accepted. Rather, Attorney Waldron's decision to present the fully-formed plea offer to the trial court to determine its viability before presenting it to Appellant was not ineffective assistance but, instead, entirely reasonable and permissible under Pennsylvania jurisprudence. Since Attorney Waldron did not render ineffective assistance of counsel, his alleged ineffectiveness cannot have caused Appellant to plead guilty. Thus, we discern no error in the PCRA court's dismissal of this claim.

---

[4] Insofar as Appellant assails the PCRA court for basing its decision on the trial court's statement of non-participation, we observe that the testimony from Attorney Waldron was sufficient on its own to establish that Appellant's plea was not involuntary.

## II. Challenges to the Effective Assistance of Counsel

We now turn to Appellant's ineffective assistance of counsel claim, which includes several sub-arguments. We first observe that counsel is presumed to be effective and the petitioner bears the burden of proving otherwise. *See Johnson*, *supra* at 68 (citation omitted). To do so, the petitioner must establish the following three elements:

> (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different.

*Id*. (citations omitted). Failure to prove any of the three elements will result in dismissal of the ineffectiveness claim. *Id*. (citation omitted).

The first prong involves a legal determination of whether the claim has arguable merit. *See Commonwealth v. King*, 259 A.3d 511, 520 (Pa.Super. 2021). As to the second prong, this Court does "not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken." *Id*. (cleaned up). "The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success." *Id*. (cleaned up). Finally, a petitioner establishes prejudice "if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id*. at 521 (cleaned up).

### A. Ineffectiveness During Plea Proceedings

At the outset, we dispose of Appellant's claim that Attorney Waldron was ineffective for improperly involving the trial court in plea negotiations and failing to discuss the plea with Appellant until after the terms were set by the trial court. *See* Appellant's brief at 66-68. As discussed *supra*, the foundation of this claim is fundamentally flawed as the trial court did not actively participate in plea negotiations nor set the terms of the plea. The certified record establishes that the plea was negotiated by Attorney Waldron and the Commonwealth before they met with the trial court to determine if the court would accept the proposed plea. The court merely indicated the minimum sentence it would accept from the range set by the plea agreement. As the underlying claim lacks merit, Appellant's ineffectiveness claim in this regard fails.[5]

**B. Ineffectiveness During Decertification Proceedings**

We next turn to Appellant's arguments that Attorney Waldron rendered ineffective assistance during the decertification process. ***See generally*** Appellant's brief at 41-66. Before addressing these allegations, we set forth the legal principles relevant to such proceedings. In this context, "[w]hen the Commonwealth charges a juvenile with murder, jurisdiction is vested with the

_____

[5] Appellant also argues, in a single paragraph, that counsel provided incorrect advice regarding the possibility of a future sentence reduction, and states that this "only further demonstrates the involuntary nature of her plea and the ineffectiveness of his representation." Appellant's brief at 68 (citation omitted). Since we have concluded that counsel's plea representation was otherwise effective and Appellant does not argue on appeal that this allegedly ineffective advice, standing alone, caused Appellant to plead guilty, we do not consider this argument further.

criminal division of the court of common pleas. However, a juvenile charged with murder may request that the matter be decertified and transferred to the juvenile division for adjudication." *Commonwealth v. Green*, 265 A.3d 798, 800 (Pa.Super. 2021). In determining whether to grant a decertification petition, the juvenile defendant "shall be required to establish by a preponderance of the evidence that the transfer will serve the public interest." 42 Pa.C.S. § 6322(a). To make that determination, a trial court must consider the factors contained in § 6355(a)(4)(iii). *Id*. Those factors are as follows.

(A) the impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

  (I) age;

  (II) mental capacity;

  (III) maturity;

  (IV) the degree of criminal sophistication exhibited by the child;

- 15 -

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

(VIII) probation or institutional reports, if any; [and]

(IX) any other relevant factors[.]

42 Pa.C.S. § 6355(a)(4)(iii).

In the case *sub judice*, Appellant's argument is essentially three-fold: Attorney Waldron was ineffective for (1) failing to present other witnesses or rebuttal testimony; (2) failing to present evidence as to the specific programs available to Appellant; and (3) failing to give Appellant's expert witnesses all necessary materials. ***Id***. at 45-47. We consider these arguments *seriatim*.

### 1. Calling Additional Witnesses

Appellant argues that Attorney Waldron should have called her pastor, her counselor, the mother of her closest friend, her maternal grandmother, or her aunt to present mitigating evidence and rebut the testimony of a teacher who testified for the Commonwealth that Appellant was "a manipulative chameleon[.]" ***Id***. at 41, 46, 54, 57 (cleaned up). She further contends that he should have re-called one of the experts to rebut Dr. O'Brien's testimony that Appellant was a "budding sociopath." ***Id***. at 47 (cleaned up). In Appellant's view, "had [Attorney Waldron] presented any mitigating fact evidence at all, the trial court would have heard from people who knew

- 16 -

[Appellant] best that [she] was a loving, immature, naïve child who was caught in an abusive relationship with a violent and unstable older man." *Id*. at 56 (cleaned up).

A petitioner making such a claim must establish, for purposes of the second and third prongs of the general ineffectiveness test, that: "(1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial." *Commonwealth v. Selenski*, 228 A.3d 8, 16 (Pa.Super. 2020) (cleaned up).

> In rejecting Appellant's claim, the PCRA court found as follows:
>
> Attorney Waldron considered and weighed the options with regard to the issue of presenting character witnesses at the decertification hearing. After careful consideration, Attorney Waldron pursued the strategy of including witness information and testimony within Dr[.] Dattilio's expert report that would be admitted at the decertification hearing, but at the same time would not be subject to cross-examination. This strategy was discussed with Dr. Dattilio and it was deemed to be the best approach in light of family members' emotional state and their questionable ability to testify effectively.

PCRA Court Opinion, 1/31/22, at 26 (cleaned up). The PCRA court found this strategy to be founded on a reasonable basis. *Id*. at 28. Accordingly, the PCRA court dismissed Appellant's ineffective assistance claims pertaining to counsel's failure to call additional witnesses at the decertification hearings.

Appellant argues that the PCRA court's ruling was in error because Attorney Waldron did not explicitly direct the trial court to the summary of Dr. Dattilio's witness interviews during the decertification proceedings. *See* Appellant's brief at 59. Additionally, she contends that because Attorney Waldron did not personally interview the witnesses, he had no basis for any judgment as to how they would testify or respond to cross-examination. *Id*.

The certified record supports the findings of the PCRA court and we discern no error in its conclusion that counsel's decision not to call additional witnesses was reasonably based. Attorney Waldron explained that he did not call any rebuttal witnesses because he believed that his cross-examination of Dr. O'Brien was effective and that there was no need for additional witnesses because Dr. Dattilio had interviewed several individuals and included those in his report, which were not subject to cross-examination. *See* N.T. PCRA, 10/4/21, at 85-86. Dr. Dattilio interviewed Appellant's father, grandmother, two of the victim's work colleagues, two family friends, one of Appellant's childhood friends, and Appellant's music teacher. *See* PCRA Exhibit 2B, Dr. Dattilio's Report, at 1, 22-23. Additionally, Attorney Waldron utilized a retired FBI agent as a private investigator who interviewed potential witnesses, collected evidence, and reported his findings back to Attorney Waldron. *Id*. at 99-101. Although Attorney Waldron did not personally conduct the interviews, he testified that this arrangement provided him with the information necessary to gauge the appropriateness of calling witnesses and to make strategic decisions regarding the case. The PCRA court credited

Attorney Waldron's testimony and explanation for his actions. The PCRA court's credibility determinations are supported by the record. Accordingly, because the PCRA court found that Appellant had failed to establish that counsel acted unreasonably, the PCRA court did not err in dismissing this claim. **See King**, **supra**, 259 A.3d at 520 (noting that this Court does not utilize hindsight when considering the reasonableness of counsel's actions).

### 2. Officer Costello Interview

Appellant next argues that "Attorney Waldron failed to present any evidence regarding placements and treatment programs that would be suitable for [Appellant] . . . because he did not let Officer Costello interview her to make that evaluation." Appellant's brief at 46 (citation omitted). According to Appellant, this "left Officer Costello unable to [opine] on the suitability of any particular juvenile facility . . . or how long [Appellant] might remain in detention – issues that the trial court found material in its ruling on decertification." **Id**. at 55 (cleaned up).

In dismissing this claim, the PCRA court found that Attorney Waldron "made the strategic decision not to have Officer Costello conduct an intake interview/assessment of [Appellant] because Attorney Waldron was concerned that should [Appellant] relate yet another version of events to the probation officer, additional problems and issues could be created." PCRA Court Opinion, 1/31/22, at 35-36 (cleaned up). As such, the PCRA court concluded that Attorney Waldron's decision to call Officer Costello regarding

the dispositional alternatives and to not have her interview Appellant was "rationally and tactically driven." *Id*. at 36.

Attorney Waldron testified that he did not have Officer Costello conduct an intake interview because he was "concerned that if [Appellant] told another story it would come back to bite us, because she had told so many different stories from the time that she was arrested[.]" N.T. PCRA, 10/4/21, at 83-84. The certified record supports the PCRA court's findings and credibility determinations. Accordingly, the PCRA court did not err in finding that Appellant had failed to establish that Attorney Waldron's actions were unreasonable.

Moreover, Appellant has failed to establish prejudice as to this claim. Instead of focusing upon Officer Costello's lack of an interview, our review reveals that the trial court focused upon Appellant's background, the seriousness of the crimes, Appellant's culpability, and the fact that the two facilities recommended by Officer Costello had at most kept a juvenile in placement for two and one-half years because they "are designed with a shorter duration of treatment in mind." Trial Court Opinion, 11/19/15, at 34-35. Given all of these factors, the trial court concluded that the juvenile facilities would be inadequate because more likely than not Appellant "would be released long before she attains the age of twenty-one[.]" *Id*. at 35. Ultimately, the court found decertification was "not appropriate because of the serious nature of the charge and the criminal sophistication exhibited." *Id*. at 36 (citation omitted). The trial court further found that Appellant's "mental

capacity is not an issue, except where it plays into her sophistication[, Appellant] presented herself as an arrogant, superior, high school student who even referred to herself as a woman." *Id*. (cleaned up). Accordingly, the trial court found Appellant's "amenability to treatment, supervision or rehabilitation as a juvenile [wa]s suspect at best." *Id*. (cleaned up).

Based on the foregoing, the PCRA court did not err in dismissing this claim.

### 3. Providing Materials to Expert Witnesses

Finally, we turn to the PCRA court's dismissal of Appellant's claim that counsel failed to provide material evidence to Appellant's experts. According to Appellant, Attorney Waldron rendered ineffective assistance by failing to provide the expert witnesses with a military police report pertaining to co-defendant Barnes' proclivity for violence and knives, photos Barnes had of his knives, and the full history of telephone calls and text messages between Appellant and Barnes, as well as deliberately withholding a sexual assault report wherein Appellant claimed that Barnes had raped her. *See* Appellant's brief at 46, 51-52. Appellant argues that if "Attorney Waldron properly prepared his experts, the trial court could not have completely disregarded their testimony, and their testimony would have been even more compelling." *Id*. at 56 (cleaned up).

By way of background, following Appellant's police interview, a sexual assault report by Debra Esernio-Jenssen, M.D., was generated. Therein, Appellant stated that co-defendant Barnes had raped her twice, approximately

one week before the murder and a second time during the early morning hours following the murder. Regarding the report of abuse following the murder, she stated after returning to her home, Barnes put his hand over her mouth, pinned her arms down, and forcibly had vaginal intercourse with her. *See* PCRA Exhibit D-9, CY104 Report of Suspected Child Abuse to Law Enforcement, Notes by Dr. Ersenio-Jenssen, 3/16/15, at 2. The report indicated bruising on the right side of Appellant's neck, her left buttock, and her right posterior thigh. When asked about the buttock bruising, Appellant opined that it could have been from when Barnes poured bleach in the vehicle. After the interviewer indicated that was not a likely cause, Appellant stated that Barnes had struck her buttocks. *See id*. at 5.

In dismissing this claim, the PCRA court observed that Drs. Dattilio and Berkowitz "rendered thorough opinions which explained their conclusions that [Appellant] should be decertified" and Appellant "seems to disregard that the ultimate opinions and conclusions of these experts would not change in any way by reviewing these additional documents." PCRA Court Opinion, 1/31/22, at 9-10. The PCRA court detailed the working relationship between Dr. Dattilio and Attorney Waldron, which "spann[ed] decades" and wherein "they had an implicit understanding on the method of providing discovery[.]" *Id*. at 10. This involved Dr. Dattilio providing an initial form listing documents he wanted to review, which Attorney Waldron would then provide, and Dr. Dattilio supplementing that form with additional document requests "as a result of his

forensic interviews, review of documents, psychological testing, and assessments." *Id*.

The PCRA court noted that Dr. Dattilio interviewed Appellant five times and was in communication with Attorney Waldron. *Id*. at 11. Since Dr. Dattilio was aware of the available discovery, the PCRA court found that if he wanted to view any other materials, he could have contacted Attorney Waldron to obtain those materials. *Id*. at 11-12. Ultimately, the PCRA court concluded that had Dr. Dattilio been provided additional materials, his "opinion would not have changed." *Id*. at 16. Therefore, the PCRA court concluded that "there is no reasonable probability that the outcome of the decertification hearing would have changed." *Id*.

As with Dr. Dattilio, the PCRA court concluded that if Dr. Berkowitz had desired to look at additional materials, he could have asked Attorney Waldron but declined to do so. *Id*. at 19-20, 22. Like Dr. Dattilio, Dr. Berkowitz indicated that even if he had received the additional materials, they "would not have changed the ultimate opinion that he rendered." *Id*. at 24. Thus, the PCRA court found that "there is no reasonable probability that the outcome of the decertification hearing would have been different." *Id*. at 25.

Appellant stresses that the fact that the experts would not change their conclusions is not the issue. *See* Appellant's brief at 65-66. Rather, she contends that she was prejudiced because "Attorney Waldron's failure to give his experts a complete record to review led the trial court to disregard their testimony in its entirety." *Id*. at 50 (cleaned up); *see also id*. at 65 ("The

question is whether there is a reasonable probability that the **outcome of** [**Appellant's**] **decertification hearing** would have been different – *i.e.*, whether a reasonable, conscientious and impartial factfinder, either at the trial level or on appeal, would have found [Appellant] amenable for treatment in the juvenile system.") (emphasis in original; cleaned up)).   Appellant elaborates:

> Had the trial court not completely rejected the testimony of Drs. Dattilio and Berkowitz due to Attorney Waldron's failure to give them material information, it would have had to decide [Appellant's] case based on a record in which two highly credible experts with extensive experience in child psychology and psychiatry opined that [Appellant] was amenable to treatment, while the Commonwealth's expert expressed no opinion as to whether [Appellant] was amenable to treatment.

*Id*. at 50-51 (cleaned up).

Upon review of the certified record, we conclude that Appellant has failed to prove prejudice regarding counsel's alleged ineffectiveness during the decertification proceedings.  As detailed *supra*, amenability to treatment was but one of the seven factors to be considered by a court when addressing decertification.   **See** 42 Pa.C.S. § 6355(a)(4)(iii)(A-G).   Based on the foregoing, the trial court did not deny decertification solely based upon its discrediting of the reports of Dr. Dattilio and Dr. Berkowitz.  In fact, Appellant's lack of amenability to treatment was not even the most heavily-weighted factor against decertification.  Critically, the trial court found that the impact of the offense on the victim, the impact of the offense on the community, and Appellant posing a threat to public safety all weighed against Appellant.  **See**

Trial Court Opinion, 11/19/15, at 24-26. As to the fourth and fifth factors, the court found that "[**n**]**o factors weigh so heavily** to this [c]ourt as do the sophistication of the crimes committed and [Appellant's] degree of culpability in the commission thereof." *Id*. at 25-26 (citation omitted, emphasis added). Given this backdrop, even if the trial court had not discredited the opinions of Appellant's experts, Appellant has not established that the trial court likely would have granted decertification.

Moreover, the record supports the PCRA court's finding that Attorney Waldron's actions were reasonable. Attorney Waldron testified extensively as to the decades-long back-and-forth relationship he had with Dr. Dattilio regarding what materials would be provided for Dr. Dattilio's review on a given case. *See* N.T. PCRA, 10/4/21, at 116, 120-23. Specifically, that Dr. Dattilio would make an initial form request and then follow-up with any additional requests based upon his evaluation. *Id*. Attorney Waldron instituted the same procedure with Dr. Berkowitz. *Id*. at 131. In practice, Dr. Dattilio ultimately acted as the intermediary between Dr. Berkowitz and Attorney Waldron. *See* N.T. PCRA, 10/10/21, at 58.

Although Dr. Dattilio initially testified that he asked Attorney Waldron to turn over all the discovery in his possession, he later clarified that he initially submitted a form request and then, "as more things g[o]t [his] attention, [he would] either call [Attorney Waldron's office] or send another slip and say, [he] also need[ed] these and these and these." N.T. PCRA, 10/6/21, at 181.

- 25 -

The PCRA court credited the testimony establishing that Dr. Dattilio would initiate requests for specific documents and Attorney Waldron would then ensure those were turned over. Based on the foregoing, the PCRA court concluded that Attorney Waldron ensured that the expert witnesses had all relevant discovery available to them, he would provide whatever specific items were requested, and that he believed the experts had all materials necessary to render an informed opinion. These findings are supported by the record.

Attorney Waldron testified that Drs. Dattilio and Berkowitz had access to all the available discovery and Attorney Waldron reiterated again and again that if either expert expressed that they needed additional information, he would have provided it. *See* N.T. PCRA, 10/4/21, at 65, 71, 79, 81. It is not incumbent upon trial counsel to sit in the shoes of an expert witness and guess at what the expert might need to render an opinion in their field of expertise. Attorney Waldron ensured that the experts were aware of all discovery and that they would receive whatever portion of the discovery they desired. Drs. Dattilio and Berkowitz were experienced and well-renowned experts in their fields, and Attorney Waldron reasonably believed that his experts would fare better in the "battle of the experts" because Dr. O'Brien did not do any testing, only interviewed Appellant once, and only testified for the Commonwealth. *See* N.T. PCRA, 10/4/21, at 137. That the trial court may have disagreed does not amount to ineffective assistance of counsel.

Regarding the sexual assault report, Attorney Waldron indicated that based upon his conversations with Appellant, her statements therein about

being raped were not truthful. *See id*. at 67-68. As to the bruising noted in the report, Attorney Waldron testified that he was unsure if those bruises occurred as a result of any "activity or actions she had regarding the killing of her mother," which included a twenty-minute struggle, using a shovel to dig a grave in the frozen ground, jumping out of a moving vehicle, and walking a mile back to Appellant's house. *Id*. at 70, 187-88. Based on the foregoing, and after speaking to Appellant, he did not find the report helpful and therefore did not provide it to the expert witnesses. *Id*. at 158-59. The PCRA court's conclusion that this was a reasonable strategy is supported by the record.

Stated succinctly, we will not deem Attorney Waldron ineffective because the trial court decided that his experts did not review enough materials to render a convincing report. The trial court chose to credit Dr. O'Brien over Drs. Dattilio and Berkowitz, as it was permitted to do. As discussed at length *supra*, providing additional materials to Dr. Dattilio and Dr. Berkowitz would not have altered the trial court's assessment of the evidence. Accordingly, the PCRA court did not err in dismissing this claim.

## C. Ineffectiveness During Appellate Proceedings

Lastly, we turn to Appellant's claim regarding Attorney Waldron's representation on appeal. Specifically, Appellant argues that the trial court erred in concluding that she was not amenable to treatment because she did not have a recognized mental health diagnosis, and Attorney Waldron rendered ineffective assistance by failing to cite ***Commonwealth v. Kocher***,

602 A.2d 1308 (Pa. 1992), in arguing this issue on direct appeal. *See* Appellant's brief at 69-70.

We begin with the following background. In *Kocher*, our Supreme Court considered how a trial court should consider the presence or absence of a mental disease or defect in the context of decertification proceedings, holding as follows:

> The Court of Common Pleas in its discretion may find that a behavioral disorder is a factor to be considered in determining whether the child is amenable to treatment now; it may also find that a sound mind devoid of any disease or defect at the time of the murder is a factor weighing against transfer of the case to juvenile court. But to find that a lack of mental disorder is dispositive of the entire amenability question is to distort the clear legislative scheme.

*Commonwealth v. Kocher*, 602 A.2d 1308, 1315 (Pa. 1992).

In dismissing this claim, the PCRA court noted that Attorney Waldron had raised nine issues in Appellant's Rule 1925(b) concise statement on direct appeal, including an allegation that the trial court erred in "denying decertification when it concluded that [Appellant's] amenability to treatment is beyond questionable because she lacks any recognized diagnosis of a mental infirmity or disorder." PCRA Court Opinion, 1/31/22, at 38 (cleaned up). However, Attorney Waldron ultimately decided to pursue and brief three issues for this Court's consideration, which did not include that allegation. The PCRA court found that it could "not fault Attorney Waldron, a highly-experienced defense attorney, for deciding to utilize the strategy of being concise in the filing and briefing of the appeal and focusing on the potentially

- 28 -

primary meritorious arguments, as opposed to diluting them by including other flawed or less meritorious issues." *Id*.

The PCRA court's findings are supported by the certified record. At the evidentiary hearing, Attorney Waldron testified that he appealed various aspects of the decertification decision and argued the appeal before this Court. *See* N.T. PCRA, 10/4/21, at 140-41. He elaborated that he had culled the issues argued on appeal after filing the concise statement and that this Court addressed the mental defect issue under the totality of the circumstances in finding that the trial court had looked at all the factors and determined that the burden was not met for decertification. *Id*. at 142-43.

Appellant focuses on the following statement from the trial court, in its decertification petition, as evidence that the trial court contravened the holding in *Kocher*: "This Court notes that Dr. Dattilio, Dr. Berkowitz, nor Dr. O'Brien found [Appellant] to suffer from any mental infirmity or disorder recognized by the DSM-V. As [Appellant] lacks any recognized diagnosis, her amenability to treatment is beyond questionable." Trial Court Opinion, 11/19/15, at 33 n.18. Appellant contends that her lack of a diagnosis "should, if anything, have weighed in her favor[.]" Appellant's brief at 69.

Instantly, the trial court did not find that Appellant was not amenable to treatment solely due to a lack of a mental health diagnosis. Rather, the court found that Appellant's propensity to lie to suit her situation would make it impossible to gauge her progress or the degree to which she was benefiting from treatment. *See* Trial Court Opinion, 11/19/15, at 29 (noting that Dr.

Dattilio acknowledged that Appellant lies); *id*. at 32-33 (stating that, given Appellant's manipulative ability to adjust her manner in accordance with her audience and for her own self-interest, "'it would be impossible to gauge the degree to which [Appellant] was benefiting from treatment . . . or accurately assess [her] progress'" (quoting Dr. O'Brien's report)). That she did not have a mental health diagnosis was but another factor rendering her amenability to treatment suspect.

As discussed, the Court in *Kocher* explicitly held that a trial court may consider the lack of a diagnosis **as a factor against decertification**, so long as it does not find the "lack of mental disorder . . . dispositive of the entire amenability question[.]" *Kocher*, *supra* at 1315. The trial court considered Appellant's lack of a mental health diagnosis as a factor against decertification, which is perfectly in line with the holding in *Kocher*. Since this Court will not find Attorney Waldron ineffective for failing to present a legally erroneous argument on direct appeal, the PCRA court did not err in dismissing this claim.

For the foregoing reasons, we hold that Appellant has failed to satisfy her "burden to persuade us that the PCRA court erred and that relief is due." *Commonwealth v. Stansbury*, 219 A.3d 157, 161 (Pa.Super. 2019) (cleaned up. Therefore, we affirm the order dismissing Appellant's PCRA petition.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 1/19/2023*